UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>MARLON IRON CROW,<br><br>Defendant. | CR. 16-50148-JLV<br><br><br>ORDER |

## INTRODUCTION

A jury convicted defendant Marlon Iron Crow of second degree murder. (Docket 109). Defendant filed post-trial motions. (Docket 114). He seeks a judgment of acquittal under Rule 29(c) of the Federal Rules of Criminal Procedure or, in the alternative, a new trial under Rule 33(a). Id.

## TRIAL EVIDENCE

The court limits its recitation to those facts necessary to resolve defendant's pending motions. In the subsequent legal analysis, the court includes additional facts as needed. The court relies primarily on the transcripts produced after trial, (Dockets 127, 129-32 & 134), as well as its recollection of the evidence presented at trial.

On November 11, 2016, Craig Charging Crow died in Porcupine, South Dakota, at the home of Nicole Morsette. It happened when Morsette, Jonathan Tenorio, L.T., Charging Crow and defendant were in the home. L.T. is the son of Morsette and Tenorio and was 12 years-old at the time; Morsette and defendant are half-siblings. (Docket 130 at pp. 49, 94).

L.T. testified that on November 10, 2016, Morsette and Tenorio drank vodka with defendant.   Id. at pp. 52-53.   Everyone slept at the residence, L.T. remembered waking up on November 11 around 7 a.m. and the others got up a few hours later.   Id. at pp. 55-56.   L.T. testified the three adults began drinking vodka once they woke up and gathered in the dining room. Id. at pp. 57-58.   After L.T. finished breakfast, Charging Crow and a woman named Delores arrived with vodka and joined the adults in the dining room. Id. at pp. 58-60.   L.T. testified soon it was just his parents and him watching television together when Charging Crow and defendant came back to the residence with approximately eight cans of an alcoholic drink called Joose.   Id. at pp. 61-65.   Charging Crow, defendant, Morsette and Tenorio opened the cans of Joose in the kitchen, and L.T. observed they were intoxicated.   Id. at pp. 67-68.

While the adults drank in the kitchen, L.T. heard Charging Crow say, "I will knock you out," to defendant.   Id. at pp. 69-70.   L.T. believed Charging Crow made the comment as a joke because he laughed when he said it.   Id. at p. 70.   Defendant responded, "Try it."   Id.   L.T. testified defendant went toward Charging Crow and the two began knocking items over and punching each other in the face.   Id. at pp. 70-71.   At a point in the fight, L.T. saw Charging Crow backing away and defendant continuing to punch his face.   Id. at pp. 72-73.   They made contact with a table, breaking it, and Charging Crow "gets knocked out" and fell to the floor.   Id. at pp. 73-74.   L.T. testified defendant "keeps on hitting" Charging Crow on the ground and L.T.'s parents failed to pull defendant away to stop him.   Id.

at p. 75.   According to L.T.'s testimony, defendant put on boots, adjusted Charging Crow's body so it was flat on the floor and stomped on Charging Crow's chin area.   Id. at pp. 76-77.[1]

Morsette testified she, defendant and Tenorio drank approximately half of a gallon of vodka on November 10, 2016.   Id. at p. 96.   On the next day, November 11, Morsette recalled Charging Crow and Delores arriving empty-handed before they left and came back with alcohol that they drank while L.T. watched television.   Id. at pp. 98-99.   Charging Crow and defendant brought Delores home.   Morsette laid down with Tenorio and L.T. Later Charging Crow and defendant returned with cans of Joose.   Id. at pp. 100-01.   After Charging Crow and defendant entered the home, the adults were in the kitchen and Morsette remembered Charging Crow laughing and stating, "I bet I can knock you out, Marlon," and defendant responding, "Try it."   Id. at pp. 103-04.

Morsette testified defendant approached Charging Crow and struck him in the face and the two proceeded to exchange blows until Charging Crow fell to the ground.   Id. at pp. 105-06.   When asked about a prior statement she made to law enforcement right after Charging Crow's death, Morsette indicated she stated defendant kicked and stomped on Charging Crow.   Id. at pp. 110-11.   She and Tenorio were unable to pull defendant

---

[1]Defense counsel cross-examined L.T. and provided the jury the opportunity to decide whether L.T.'s testimony was impeached.   Id. at pp. 86-90, 92.

off Charging Crow.  Id. at p. 111.   When Charing Crow did not respond to efforts to revive him, Tenorio called 911.   Id. at p. 114.[2]

Leonard Her Many Horses, a Lieutenant with the Oglala Sioux Tribe Department of Public Safety, responded to Morsette's home.   Id. at p. 125. The Lieutenant described Charging Crow as "bluish" and noticed he was not breathing.   Id. at p. 126.   The Lieutenant observed some blood on Charging Crow's face, "a cut on his lip and just general swelling or bruising."   Id. at p. 127.

A Special Agent with the Federal Bureau of Investigation ("FBI"), Mark Lucas ("SA Lucas"), recorded an interrogation of defendant after Charging Crow's death.   (Exhibit 138).   The recording was a trial exhibit played for the jury.   (Docket 130 at p. 247).   In the interrogation, defendant stated Charging Crow struck him first and he wrestled and punched Charging Crow to defend himself.   (Exhibit 138).[3]

The jury heard testimony from Donald Habbe, M.D., the forensic pathologist who conducted Charging Crow's autopsy.   Dr. Habbe determined Charging Crow suffered a tear to his basilar artery, which resulted in a subarachnoid hemorrhage causing Charging Crow's death.

---

[2]Defense counsel cross-examined Morsette, allowing the jury to weigh her testimony in light of possible grounds for impeachment defense counsel presented.   Id. at pp. 165-75

[3]The government's brief provides an excerpt from the interrogation. (Docket 142 at p. 14).

(Docket 129 at pp. 59-60).[4]   In Dr. Habbe's experience, a fatal injury to the basilar artery is rare.   Id. at pp. 59-61.   Dr. Habbe explained "this traumatic subarachnoid hemorrhage" usually occurs when "[y]ou have an intoxicated individual; they are in some type of altercation; it's typically a bar fight.   And they take a blow to the head, and after that blow they drop, and they are dead almost immediately, or very shortly after that, that that blow is inflicted."   Id. at p. 61.   Dr. Habbe testified Charging Crow's face had a "split lip" from a "blunt force injury" and "a scrape on his chin."   Id. at pp. 63-64.   When he internally examined Charging Crow's head, Dr. Habbe discovered "four areas of hemorrhage or bleeding in the subcutaneous tissues of the scalp."   Id. at p. 69.   Dr. Habbe located these injuries on the left side of the head and opined blunt force trauma caused them.   Id. at p. 70.   Dr. Habbe testified blunt force trauma encompasses punches, kicks and hitting the ground after falling.   Id. at pp. 70 & 73; (Docket 130 at p. 23).

Defendant called Brian Levenson, R.N., to the stand.   Once Charging Crow arrived at the hospital in Pine Ridge, South Dakota, Nurse Levenson treated him.   (Docket 130 at p. 269).   Nurse Levenson testified the external injuries to Charging Crow's lip and chin could be caused by the intubation tube used on Charging Crow before he reached the hospital.   Id. at pp. 272-73.   Based on Nurse Levenson's training and experience, he opined

---

[4]Dr. Habbe explained this using medical terms and non-medical language.   Id.   He stated "subarachnoid" describes the location of bleeding (or "hemorrhage") in relation to coverings of the brain, and he testified the basilar artery is located next to the brainstem.   Id.

Charging Crow's injuries were the result of falling. Id. at 280-81. Charging Crow's high blood alcohol concentration was central to Nurse Levenson's opinion. Id. Nurse Levenson's other opinion on Charging Crow's cause of death was he drowned on his own vomit, and Nurse Levenson reached that conclusion because the weights of Charging Crow's lungs at the autopsy were higher than usual. Id. at pp. 283-84.

The government called Bernadine Blue Bird as a witness; she is an Assistant Enrollment Director for the Oglala Sioux Tribe. Id. at p. 156. She testified defendant is an enrolled member of the federally recognized Oglala Sioux Tribe. Id. at pp. 157-58. The government also called Lionel Weston, who works at the Bureau of Indian Affairs Land Operations within the United States Department of the Interior. Id. at p. 164. He testified Morsette's home is in Indian country, within the exterior boundaries of the Pine Ridge Indian Reservation. Id. at p. 165.

## ANALYSIS

### I. Rule 29(c) motion

Defendant moved for a judgment of acquittal at the conclusion of the government's case-in-chief and again later in trial. (Dockets 130 at pp. 207-11 & 131 at p. 80). The court denied both motions, finding that granting the motion would require weighing the credibility of L.T. and Morsette. (Dockets 130 at pp. 211-17 & 131 at p. 80). Defendant renews his Rule 29 motion. (Dockets 114 & 139). Defendant timely filed the Rule 29(c) motion within 14 days of the verdict. Fed. R. Crim. P. 29(c)(1).

6

Fed. R. Crim. P. 29(c) gives the district court authority to set aside a guilty verdict and enter an acquittal upon a defendant's post-trial motion. "A district court has very limited latitude in ruling upon a motion for judgment of acquittal." United States v. Baker, 367 F.3d 790, 797 (8th Cir. 2004) (citation and internal quotation marks omitted). "A motion for judgment of acquittal should be granted only if there is no interpretation of the evidence that would allow a reasonable jury to find the defendant guilty beyond a reasonable doubt." United States v. Boesen, 491 F.3d 852, 855 (8th Cir. 2007) (citations and internal quotation marks omitted). This standard is very strict, and the court should not overturn a jury verdict lightly. Id.

The district court must enter an acquittal if the evidence presented at trial is insufficient to sustain a conviction. Id. Evidence may be direct or circumstantial. Baker, 367 F.3d at 798. "Evidence supporting a conviction is sufficient if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Boesen, 491 F.3d at 856 (citation and internal quotation marks omitted). The district court must not weigh the evidence or assess the credibility of witnesses. Baker, 367 F.3d at 797; see also Boesen, 491 F.3d at 857 ("In ruling on a motion for a judgment of acquittal, the role of the court is not to weigh the evidence . . . but rather to determine whether the Government has presented evidence on each element to support a jury verdict.") (citations and internal quotation marks omitted) (ellipses in original).

7

The district court "views the entire record in the light most favorable to the government, resolves all evidentiary conflicts accordingly, and accepts all reasonable inferences supporting the jury's verdict." Boesen, 491 F.3d at 856. In short, the court upholds the jury verdict if "drawing all reasonable inferences in favor of the verdict, there is an interpretation of the evidence that would allow a reasonable minded jury to find the defendant[] guilty beyond a reasonable doubt." Id. (citations and internal quotation marks omitted; alteration in original).

The court instructed the jury on second degree murder. (Docket 98 at pp. 5-6). It consisted of three elements: (1) on or about November 11, 2016, defendant unlawfully killed Charging Crow by assaulting him in the head; (2) defendant acted with malice aforethought; and (3) defendant is an Indian person and the offense took place in Indian country at Porcupine, South Dakota. Id. The jury also received an instruction on self defense and the government's burden of proving beyond a reasonable doubt that defendant did not act in self defense. Id. at p. 10. "The issue here is whether an interpretation of the evidence allows a reasonable-minded jury to find [defendant] guilty, beyond a reasonable doubt, of" second degree murder. See Boesen, 491 F.3d at 856. Because the court concludes that interpretation of the evidence exists, the court finds defendant fails to demonstrate he is entitled to a judgment of acquittal.

The testimony of L.T., Morsette and Dr. Habbe establish the first and second elements of second degree murder. The testimony regarding defendant's tribal membership and the location of Morsette's home in Indian

8

country satisfy the third element of the charge. (Docket 130 at pp. 156-58, 164-65). Defendant highlights avenues for impeachment of L.T. and Morsette, and at trial defense counsel thoroughly cross-examined both witnesses. Id. at pp. 86-90, 92 & 165-75. Defendant set forth explanations for Charging Crow's death contrary to the testimony of L.T., Morsette and Dr. Habbe. (Docket 139 at pp. 18-19). "The defense's impeachment of the witnesses' testimony, however, is not substantive evidence." United States v. Dowty, CR. 16-50154, 2018 WL 3421339, at *4 (D.S.D. July 13, 2018). Defendant's alternative theories found some support in the record, but they are "not sufficient for concluding no 'interpretation of the evidence allows a reasonable-minded jury to find defendant guilty, beyond a reasonable doubt.' " Id. (quoting Boesen, 491 F.3d at 856) (alterations omitted).

Both L.T. and Morsette testified to seeing defendant punch Charging Crow in the head multiple times. Defendant stated in his interrogation with SA Lucas that he punched and wrestled Charging Crow. L.T. testified that after Charging Crow was on the ground and not moving, defendant took the time to put on boots and stomp on Charging Crow's head. Defendant's actions demonstrate "an intent, at the time of the killing, willfully to take the life of a human being, or[,]" at the least, "an intent willfully to act in callous and wanton disregard of the consequences to human life[.]" (Docket 98 at p. 5). While the evidence showed Charging Crow fought back against defendant, L.T. and Morsette's testimony establish defendant did not act in self defense. Dr. Habbe's testimony

supports finding defendant's conduct, the punching and stomping, caused Charging Crow's fatal injury.

Based on the trial record, the court finds a "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Boesen, 491 F.3d at 856 (internal quotation marks omitted). Put another way, the court finds the record fails to establish that "there is no interpretation of the evidence that would allow a reasonable jury to find the defendant guilty beyond a reasonable doubt." Id. at 855 (internal quotation marks omitted). The court comes to this conclusion after "drawing all reasonable inferences in favor of the verdict[.]" Id. at 856 (internal quotation marks omitted). The court denies defendant's Rule 29(c) motion.

## II.  Rule 33(a) motion

Fed. R. Crim. P. 33(a) gives the district court authority to vacate a judgment and grant a new trial in the interest of justice. Defendant timely filed his motion within 14 days of the verdict. Fed. R. Crim. P. 33(b)(2). The decision to grant or deny a Rule 33 motion "is within the sound discretion of the [district] court." United States v. Campos, 306 F.3d 577, 579 (8th Cir. 2002). The court's discretion is both broad and limited. Id. It is broad to the extent the court "can weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain the verdict." Id. (internal quotation marks and citations omitted). "[T]he court need not view the evidence most favorably to the verdict." United States v. Worman, 622 F.3d 969, 977 (8th Cir. 2010); United States v. Lacey, 219 F.3d 779, 783-84 (8th Cir. 2000) (In determining whether to

grant a Rule 33 motion, "the court need not view the evidence in the light most favorable to the government, but may instead weigh the evidence and evaluate for itself the credibility of the witnesses.").

The court's discretion is limited to the extent the court must allow the jury's verdict to stand unless it determines a miscarriage of justice will occur. Id.; see also United States v. McCraney, 612 F.3d 1057, 1064 (8th Cir. 2010) ("Where a defendant moves for a new trial on the grounds that the verdict is contrary to the weight of the evidence, the district court should grant the motion if the evidence weighs heavily enough against the verdict that a miscarriage of justice may have occurred.") (internal quotation marks and citation omitted); Worman, 622 F.3d at 978 ("A district court will upset a jury's finding only if it ultimately determines that a miscarriage of justice will occur."); United States v. Camacho, 555 F.3d 695, 705 (8th Cir. 2009) ("[A] new trial motion based on insufficiency of the evidence is to be granted only if the weight of the evidence is heavy enough in favor of acquittal that a guilty verdict may have been a miscarriage of justice."); United States v. Lincoln, 630 F.2d 1313, 1319 (8th Cir. 1980) ("If the court concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury.").

Because a motion for new trial based on the weight of the evidence is "generally disfavored," the district court should use its authority to grant a

Rule 33 motion "sparingly and with caution." Campos, 306 F.3d at 579 (internal quotation marks and citations omitted); see also United States v. Bertling, 510 F.3d 804, 808 (8th Cir. 2007) ("A district court should not grant a motion for a new trial simply because it would have reached a different verdict.") (citations omitted).

### a. Sufficiency of the evidence

Similar to the arguments underlying defendant's Rule 29(c) motion, he emphasizes the various grounds for finding testimony was impeached and alleges alternate theories of Charging Crow's death. (Docket 139 at p. 20). Defendant, however, fails to identify evidence sufficient to support his motion. Even if the court "would have reached a different verdict[,]" that is not a proper basis for ordering a new trial. See Bertling, 510 F.3d at 808. The court finds defendant does not justify a remedy this court may provide only "sparingly and with caution." Campos, 306 F.3d at 579.

The court does not find "the weight of the evidence is heavy enough in favor of acquittal that a guilty verdict may have been a miscarriage of justice." See Camacho, 555 F.3d at 705. In making its determination, the court weighed the evidence and assessed the credibility of the witnesses. See Lacey, 219 F.3d at 783-84. The court considered the oral arguments of defense counsel at trial, defense counsel's written submissions and the trial transcripts. The jury was faced with the difficult tasks of weighing the evidence and assessing witness credibility. The jury was in the best position

to perform this function. Although the jury's verdict was contrary to defendant's interests, that does not render the verdict a miscarriage of justice. Based in part on the same reasoning already provided, the court finds defendant is not entitled to a new trial on the indictment for sufficiency of evidence grounds under Fed. R. Crim. P. 33(a).

### b. Prosecutorial misconduct

To receive a new trial based on prosecutorial misconduct, "defendant must show that the government's conduct was improper and that it 'affected the defendant's substantial rights so as to deprive him of a fair trial.' " United States v. Clayton, 787 F.3d 929, 933 (8th Cir. 2015) (quoting United States v. Hunter, 770 F.3d 740, 743 (8th Cir. 2014)) (some internal quotation marks omitted). "In assessing the prejudicial impact of prosecutorial misconduct [the court] must consider: 1) the cumulative effect of the misconduct; 2) the strength of the properly admitted evidence; and 3) the curative actions taken by the district court." United States v. Wadlington, 233 F.3d 1067, 1077 (8th Cir. 2000).

While "a single misstep on the part of the prosecutor may be so destructive to the right to a fair trial that reversal is mandated[,] . . . the key question ultimately is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " United States v. Schneider, 157 F. Supp. 2d 1044, 1055 (N.D. Iowa 2001) (quoting Darden v. Wainwright, 477 U.S. 168, 181 (1986)). The government may not vouch for a witness' credibility, and "[i]mproper vouching may occur when the government expresses a personal opinion

about credibility, implies a guarantee of truthfulness, or implies it knows something the jury does not." United States v. Atkins, 881 F.3d 621, 626 (8th Cir. 2018) (internal quotation marks omitted); see United States v. Roundtree, 534 F.3d 876, 880-81 (8th Cir. 2008) (collecting cases on improper vouching).

Defendant argues the prosecutor repeatedly committed misconduct. Defendant claims the prosecutor testified to the jury while examining witnesses, made the trial "a personal matter" and uttered false statements in closing argument. (Docket 139 at p. 22). In defendant's view, the prosecutor vouched for the credibility of Morsette in violation of the court's pretrial rulings. Id. at pp. 22-23. Defendant contends SA Lucas improperly commented on the credibility of Tenorio. Id. Defendant asserts this occurred when defense counsel asked about not collecting other pairs of shoes at the scene: "But we are going back to the facts as you know them. This is the shoe worn by a man who had spun a story to law enforcement and locked Ms. Morsette and a 10-year-old boy in a room?" (Docket 130 at p. 232). SA Lucas answered, "There's no evidence that he spun a story. In fact, talking to him on the phone and talking to the officers on-scene, they tended to believe what Lee Tenorio had to say." Id. According to defendant, SA Lucas' answer violated the court's pretrial ruling prohibiting either party from introducing any statement bearing on the veracity of a witness. (Docket 132 at pp. 42-46).

The court finds defendant fails to establish prosecutorial misconduct warranting a new trial. Some of the alleged misconduct defendant targets

occurred outside the presence of the jury or during a bench conference where the jury is unable to hear the matters discussed. (Docket 139 at pp. 22-23). The court considers those instances of conduct, but the focus of this analysis is the effect of the government's conduct on the jury. See Wadlington, 233 F.3d at 1077. While the court found the government improperly attempted to vouch for Morsette's credibility, that conduct was limited and the court provided the necessary "curative instruction[.]" See United States v. Emmert, 9 F.3d 699, 701-02 (8th Cir. 1993). In this case, similar to Emmert, the prosecutor "improperly vouched" for the truthfulness of a witness, but there was still a fair trial because "there was no cumulative detrimental effect" and the court "gave [a] cautionary instruction[.]" Id. Separate from the government's vouching, the "evidence properly admitted at trial" through L.T., Dr. Habbe and in part Morsette "supports the defendant['s] conviction[.]" Id. at 702. Defendant's argument about SA Lucas' testimony on Tenorio's statements does not change the court's determination. Defense counsel's question, which included a remark that Tenorio "spun a story to law enforcement[,]" commented on Tenorio's honesty and SA Lucas responded to that remark. (Docket 130 at p. 232). Both SA Lucas and defense counsel provided improper commentary on Tenorio's truthfulness.

### c. Outrageous government conduct

Defendant "reasserts" his previously-denied motion to dismiss the indictment based on "outrageous government conduct." (Docket 139 at pp. 23-24). On this point, defendant claims the government intimidated Morsette when the prosecutor and an FBI agent spoke with her at her home shortly before trial. Id. Defendant's original motion argued L.T. was present for the intimidation, so his testimony would be contaminated as well. (Docket 70). Following the court's denial of defendant's motion, the government filed a motion to prohibit the defense from making any reference to the prosecution threatening a witness or engaging in "outrageous conduct." (Docket 81). The court denied the motion so the defense could fully cross-examine all witnesses, but the court advised the parties to readdress the issue if the defense intended to use the word "outrageous." (Docket 129 at pp. 4-6).

"Outrageous Government conduct requires dismissal of a charge 'only if it falls within the narrow band of the most intolerable government conduct.' " United States v. Bugh, 701 F.3d 888, 894 (8th Cir. 2012) (quoting United States v. Morse, 613 F.3d 787, 792-93 (8th Cir. 2010)). To prevail on a witness intimidation claim, defendant must demonstrate sufficient prejudice based on the government's conduct. In United States v. Habhab, 132 F.3d 410, 415 (8th Cir. 1997), the United States Court of Appeals for the Eighth Circuit rejected a due process witness intimidation argument because the defendant failed to show she "suffered any actual prejudice as a result." See also Peeler v. Wyrick, 734 F.2d 378, 381-82 (8th Cir. 1984) (discussing prejudice).

16

Both Morsette and L.T. testified.   When denying defendant's original motion to dismiss the indictment, the court noted, "[t]he matters [the defense is] raising, of course, are the subject of direct and cross-examination."   (Docket 132 at pp. 29-30).   Defense counsel vigorously cross-examined Morsette and L.T.   (Docket 130 at pp. 86-90, 92 & 165-75).   Even if the government's conduct was improper, a finding the court does not make, defendant fails to show sufficient prejudice.   See Habhab, 132 F.3d at 415; Bugh, 701 F.3d at 894.

### d.   False testimony

Defendant argues Morsette and L.T. provided false testimony.   (Docket 139 at pp. 24-25).   He bases his argument on an affidavit from his daughter Marlee Iron Crow.   (Docket 115).   The first paragraph of the affidavit reads in pertinent part:

> On the first day of Marlon Iron Crow's trial, June 28, 2017, I visited my aunt Juanita's house after 5:00pm.   Nicki, Lee Tenorio, and [____][5] were also there.   One of ____ and Nicki's conversations were about when they testified.   ____ then told Nicki that he lied and so she asked, "what did you lie about?"   ____ said "I lied that you and my dad helped Craig."   Nicki responded to ____ saying "well I lied too about being drunk."

Id. at p. 1.   Defendant believes this confirms L.T. lied when he testified Morsette and Tenorio attempted to pull defendant away from Charging Crow. (Docket 139 at p. 24).   Defendant also asserts the paragraph above establishes

---

[5]This name is redacted from the affidavit by a black scribble each time the name appears, so the court writes it here as a blank.   Defendant's filings reveal "____" is L.T. and "Nicki" is Morsette.

Morsette testified falsely when she denied drinking earlier in the day as she testified at trial. Id.; (Docket 130 at p. 172).

The next portion of the affidavit defendant relies on relates to Morsette and Tenorio's relationship. The affidavit asserts Morsette said she feared Tenorio and he physically abused her in the past. (Docket 115 at p. 2). Defendant claims this section of the affidavit shows Morsette testified falsely when she denied past abuse by Tenorio. (Docket 139 at pp. 24-25). Lastly, the affidavit claims L.T. falsely stated defendant drank alcohol with L.T.'s parents the day before Charging Crow's death on November 10, 2016. Id. at p. 24.

"To prove prosecutorial use of false testimony, a defendant must show that: (1) the prosecution used perjured testimony; (2) the prosecution should have known or actually knew of the perjury; and (3) there was a reasonable likelihood that the perjured testimony could have affected the jury's verdict." United States v. Funchess, 422 F.3d 698, 701 (8th Cir. 2005). In discussing "prosecutorial use of false testimony," the Eighth Circuit specified, "[p]erjury entails not only false testimony, but an additional element of intent[.]" United States v. Espinoza, 684 F.3d 766, 780 (8th Cir. 2012). Defendant must show the witness "provided false testimony concerning a matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." Id. (internal quotation marks omitted).

Despite defendant's interpretation of the affidavit from his daughter, it is unclear what trial testimony the affidavit renders false. L.T.'s alleged admission he lied "that [Morsette] and [Tenorio] helped Craig" does not reveal what he means by Charging Crow receiving "help[.]" (Docket 115 at p. 1). Morsette's alleged lie "about being drunk" does not indicate whether she was untruthful about being intoxicated during her testimony or during the moments surrounding Charging Crow's death. Id. This lack of clarity prevents defendant from proving L.T. and Morsette "provided false testimony concerning a matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." Espinoza, 684 F.3d at 780. As to whether the government "should have known or actually knew" about a witness committing perjury, Funchess, 422 F.3d at 701, the government specifically indicates it had no knowledge of the allegedly false aspects of Morsette's testimony. (Docket 142 at p. 26).

L.T. and Morsette's purported lies, including the statements on Tenorio's abusive behavior and defendant drinking at Morsette's on November 10, do not carry "a reasonable likelihood that" they "could have affected the jury's verdict." Funchess, 422 F.3d at 701. The affidavit does not erode the core evidence supporting defendant's conviction: L.T. and Morsette testified about their observations of defendant's violent conduct toward Charging Crow; defendant admitted he punched and wrestled Charging Crow; and Dr. Habbe's opinions are consistent with defendant's actions causing the fatal injury to Charging Crow.

### e. Cumulative errors

Defendant claims various other "cumulative errors [ ] occurred in his trial[ ]" and asserts they serve as a basis for granting new trial. (Docket 139 at p. 26). The errors relate to events at jury selection and the testimony of Jesse Jack, SA Lucas and Nurse Levenson. Defendant cites United States v. Anwar, 428 F.3d 1102, 1115 (8th Cir. 2005), for the holding that the Eighth Circuit "may reverse where the case as a whole presents an image of unfairness that has resulted in the deprivation of a defendant's constitutional rights, even though none of the claimed errors is itself sufficient to require reversal." (Docket 139 at p. 26). Most of defendant's claimed errors go to actions of the prosecutor, so, where applicable, the court applies the law on prosecutorial misconduct as stated above. See supra Section II.b. at pp. 13-14. While defendant properly captures part of Anwar's holding, the next sentence in the case provides, "[t]his court will not reverse based upon the cumulative effect of errors unless there is substantial prejudice to the defendant." Anwar, 428 F.3d at 1115; see United States v. Melton, 870 F.3d 830, 843 (8th Cir. 2017) (quoting Anwar's complete holding).

With respect to jury selection, defendant takes issue with: a prospective juror indicating she would not believe a potential law enforcement witness important to defendant's case; the prosecutor's comments on the offense's required mental state and its distinction from first degree murder; the prosecutor mentioning a "thin-skulled plaintiff"; the prosecutor's discussion of self defense; and an objection from the prosecutor

to defendant's remarks on the government's disclosure of exculpatory evidence. (Docket 139 at pp. 3-6). The court excused the prospective juror when she stated she could not be impartial and defendant proceeded to call the law enforcement witness in his case-in-chief. (Dockets 134 at p. 33 & 131 at pp. 82-89). Any prejudice flowing from the prosecutor's statements or objections about the applicable law were cured by an immediate oral instruction from the court or the court's written primary and supplemental instructions to the jury. (Dockets 98 & 103); see Wadlington, 233 F.3d at 1077 (considering "the curative actions taken by the district court").

Defendant argues errors accumulated during the prosecutor's examination of SA Lucas and Nurse Levenson. With SA Lucas, the prosecutor attempted to introduce evidence regarding a shirt, defendant objected and the court did not admit the evidence. (Docket 131 at pp. 107-12). When the prosecutor cross-examined Nurse Levenson, the questioning required a cautionary instruction from the court that "what lawyers say is absolutely not evidence." Id. at p. 5. The prejudice, if any, from these purported errors was resolved through the court's "curative actions[.]" See Wadlington, 233 F.3d at 1077.

Defendant called Jesse Jack, an Officer with the Oglala Sioux Tribe Department of Public Safety, as a witness. (Docket 131 at p. 55). Officer Jack testified he recorded body camera footage when he arrived at the scene of Charging Crow's death. Id. at p. 56. During a bench conference, defense counsel stated she was unaware of this video and the prosecutor

indicated she was as well despite requesting all evidence from Officer Jack's office.  Id. at p. 57.  The court stated neither the parties nor the court know what the video captures, and the court "reserve[d] the right to make a further ruling[.]"  Id. at p. 58.  The issue was not developed further at trial; defendant raises it now.  (Docket 139 at pp. 16-17).

"The suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.  The individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police."  United States v. Long, 870 F.3d 741, 747 (8th Cir. 2017) (citing Brady v. Maryland, 373 U.S. 83, 87 (1963); Kyles v. Whitley, 514 U.S. 419, 437 (1995)) (internal alterations, citations and quotation marks omitted).  To prove a Brady due process violation, defendant must show: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."  Id. (internal quotation marks omitted).  Defendant raises the issue of Officer Jack's video, but he provides no information or argument on the applicable legal standard and fails to show he meets the Brady requirements.

The court finds no "substantial prejudice to the defendant" based on the cumulative effect of alleged errors.  Anwar, 428 F.3d at 1115; see Melton, 870 F.3d at 843.

**ORDER**

Based on the analysis above, it is

ORDERED that defendant's motions for a judgment of acquittal and a new trial (Docket 114) are denied.

IT IS FURTHER ORDERED that an order will be entered scheduling the necessary deadlines for defendant's sentencing hearing.

Dated August 13, 2018.

BY THE COURT:

/s/ *Jeffrey L. Viken*

JEFFREY L. VIKEN
CHIEF JUDGE